IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

DARYL EUGENE SUTTON            )
                              )
v.                            )      No. 2:06-0078
                              )      Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )


To:  The Honorable John T. Nixon, Senior Judge


### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, as provided under Titles II and XVI of the Social Security Act ("the Act"), as amended.

The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 17), to which defendant has responded (Docket Entry No. 19).  Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 14), and for the reasons given below, the undersigned recommends that plaintiff's motion be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

1

# I. Introduction

Plaintiff filed his applications for benefits on December 1, 2003, alleging the onset of disability as of November 7, 2003, due to a back injury, seizures, and kidney problems (Tr. 51, 59). Plaintiff's claims were denied on the documentary record by the state agency component of the Social Security Administration, upon initial review and again following plaintiff's request for reconsideration (Tr. 31-40). Plaintiff thereafter requested a *de novo* hearing of his claims by an Administrative Law Judge ("ALJ"). In advance of his hearing, plaintiff completed and certified his responses to thirty written interrogatories propounded at the ALJ's direction (Tr. 105-15); plaintiff subsequently affirmed the accuracy of those responses under oath at the hearing (Tr. 354). The case came to hearing on September 13, 2005, when plaintiff appeared, with counsel, and gave testimony upon examination by counsel and the ALJ (Tr. 350-70). The ALJ took the case under advisement until January 11, 2006, when he issued a written decision wherein he concluded that plaintiff was not disabled under the Act (Tr. 18-25). The decision contains the following enumerated findings:

1.  The claimant meets the nondisability requirements for a
    period of disability and Disability Insurance Benefits
    set forth in Section 216(i) of the Social Security Act
    and is insured for benefits through the date of this
    decision.

2.  The claimant has not engaged in substantial gainful
    activity since the alleged onset of disability.

2

3.  The claimant's chronic renal failure secondary to vesicoureteral reflux (VUR), seizure disorder, chronic low back pain, and chronic headaches are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity:  to perform sedentary work provided he do no climbing; no more than occasional stooping, bending from the waist to the floor, crouching, or crawling; do no work around hazards; and do no driving of motor vehicles.  In addition, the claimant needs to have work that can be "safely" interrupted, and is limited to performing simple, repetitive non-detailed tasks where co-worker and public contact is casual and infrequent, where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced.

7.  The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8.  The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9.  The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.19 as a framework for decision-making, there are a significant number of jobs

3

in the national economy that he could perform.
Examples of such jobs include work as a hand packer,
production worker, and inspector/tester/sorter, with
some 2,500 jobs in the State of Tennessee, and some
84,100 jobs in the national economy.

13. The claimant was not under a "disability," as defined
in the Social Security Act, at any time through the
date of this decision (20 CFR §§ 404.1520(g) and
416.920(g)).

(Tr. 24-25)

On August 3, 2006, the Appeals Council denied

plaintiff's request for review of the ALJ's decision (Tr. 6-8),

thereby rendering that decision the final decision of the

Commissioner. This civil action was thereafter timely filed, and

the Court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the

Commissioner's findings are supported by substantial evidence,

based on the record as a whole, then these findings are

conclusive. Id.

## II. Review of the Record[1]

An MRI of the lumbar spine taken on April 12, 2002,

after trauma, showed minimal narrowing of the L3 disc space, with

minimal circumferential bulging at the L3 disc (Tr. 275). There

was no significant spinal canal or neuroforaminal narrowing (Tr.

275). There was minimal marrow edema at the L3 site, caused

either by degeneration, or by low grade trauma, but no evidence

---

[1]The following summary of the facts is taken from defendant's response
brief (Docket Entry No. 19 at 2-9).

4

of disc herniation (Tr. 275).

A renal ultrasound taken on January 13, 2003 was abnormal, thereby necessitating a renal scan, which was taken on January 23, 2003, and showed that the right kidney was very small and "somewhat poorly functioning" (Tr. 125).

On April 15, 2003, Dr. Urath Suresh described chronic renal insufficiency with repeated urinary tract infections requiring antibiotics (Tr. 156-57). On May 30, 2003, Dr. Suresh noted that plaintiff's kidney function was stable, and that he had reflux nephropathy (Tr. 155).

From October 18-20, 2003, plaintiff was hospitalized with what he reported to be a three-week history of generalized muscle spasms, but which actually appeared to be seizures (Tr. 133). An EEG was abnormal, but a CT scan of the head and chest x-ray were normal (Tr. 133, 137, 138, 151-52).

Plaintiff followed up with Dr. Francisco Marasigan, his family practitioner, on October 21, 2003, who summarized his recent hospital course and noted that plaintiff felt pain in his back and neck at a subjective level of 10 out of 10 (Tr. 240). Dr. Marasigan also checked boxes indicating that plaintiff had paraspinal muscle spasm, muscular tenderness, and a tender spine secondary to lumbar degenerative disc disease (Tr. 240). Plaintiff had started Skelaxin and Pyridium the prior day with no dyspnea or swelling (Tr. 240).

5

Plaintiff saw Dr. Marasigan again on October 30, 2003, noting several seizures since the prior visit and complaining of headaches without nausea or vomiting (Tr. 239). Dr. Marasigan noted the same back complaints as he had at the last visit, but at the top of the page noted that plaintiff was only experiencing pain in the head (Tr. 239). This progress note also states that plaintiff had begun taking Topamax, and increased the dosage (Tr. 239).

Plaintiff was hospitalized again from November 2-5, 2003, with seizures (Tr. 145). He was initially treated with Topamax, but that was changed to Trileptal and the dosage increased after another episode of upper extremity jerking (Tr. 146). An MRI of the brain was normal (Tr. 147).

When plaintiff saw Dr. Marasigan on November 7, 2003, he noted that his headaches had resolved, but that he still had some seizure activity without loss of consciousness (Tr. 238). Dr. Marsigan checked the boxes noting the same back pain complaints, but also indicated at the top of the page that plaintiff was not experiencing any pain (Tr. 238). Dr. Marasigan ordered that the Trileptal be increased starting on November 9, 2003 (Tr. 238).

On November 24, 2003, plaintiff again saw Dr. Marasigan, stating that he had had a few episodes of general tremors of the hand without loss of consciousness or confusion

6

(Tr. 237).  No back pain was noted at this visit (Tr. 237).

Plaintiff reported that he was stretching out in bed when he heard a pop and began having a sharp, pulling pain under his left ribs on December 7, 2003, for which he sought medical treatment (Tr. 176).  A chest x-ray taken on that date was normal (Tr. 185).  He was instructed to have bed rest and to apply alternating cold and heat to the area (Tr. 186).

When Dr. Suresh saw plaintiff on December 21, 2003, he was "doing well," kidney functions were stable, and blood pressure was "very well controlled" (Tr. 154).  Plaintiff again sought treatment for seizures on December 29, 2003 (Tr. 164).

On December 31, 2003, plaintiff reported having head pain at a subjective level 10 out of 10, and stated that he was still having seizure activity without loss of consciousness or change in orientation (Tr. 235).  He reported intermittent flashing lights with headaches, but without nausea or vomiting (Tr. 235).  Dr. Marasigan instructed plaintiff to begin taking the anticonvulsant Depakote (Tr. 235).

Dr. Marasigan completed a seizure report form on January 4, 2004, upon which he indicated that plaintiff "require[s] such large doses of medicine to control [his] seizures that [he] cannot function alertly" because "recently Depakote was added, causing drowsiness" (Tr. 234).

On February 4, 2004, plaintiff's wife reported

7

increased episodes of left upper extremity jerking without loss of consciousness or general tonic/clonic activity (Tr. 230). Dr. Marasigan noted that "daytime somnolence is minimal" (Tr. 230). A State agency medical consultant completed a physical residual functional capacity ("RFC") assessment form on February 14, 2004, finding that plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently (Tr. 206). The consultant opined that plaintiff could stand and/or walk and could sit for about 6 hours out of 8, and was unlimited in his ability to push and pull (Tr. 206). The medical consultant found no postural, manipulative, or visual limitations (Tr. 207-08). He noted no environmental limitations other than the need to avoid all exposure to hazards (Tr. 209). In formulating his RFC, the medical consultant noted plaintiff's complaints of back pain, but also noted that there was no apparent examination of the back, and that an MRI was normal (Tr. 206). He noted the poor kidney function and the treating physician's notation that seizures were controlled with Trileptal and Depakote (Tr. 207). The medical consultant stated that plaintiff's RFC was limited due to the combination of his impairments (Tr. 207).

On March 12, 2004, Dr. Suresh noted that plaintiff's kidney functions had "deteriorated a little bit," but he kept the same treatment regimen and asked to see plaintiff again in four months (Tr. 228). A CT scan of the head performed on April 4,

8

2004, because of complaints of severe headaches, was normal (Tr. 256).

Dr. Lalonde, a neurologist, conducted a seizure evaluation on June 30, 2004. Plaintiff told Dr. Lalonde that medical tests showed a "black spot" on his brain, but Dr. Lalonde clarified that both the cranial CT scan and the MRI were normal (Tr. 219). Dr. Lalonde noted that plaintiff's medication was changed from Dilantin to Depakote with no side effects other than some weight gain (Tr. 219). Plaintiff was described as doing well and as not having had any recurrent seizures (Tr. 219, 200). Upon examination, motor strength was 5/5 in all extremities, and neurological exam was normal (Tr. 219).

When plaintiff next saw Dr. Lalonde on August 9, 2004, he complained "more of headache than anything else," but Dr. Lalonde also stated that "he has spells when headaches are severe that may be seizures" (Tr. 217). Plaintiff also reported that he had experienced one nighttime seizure in the prior month (Tr. 217). Dr. Lalonde speculated that if the headaches could be treated, the seizures might also improve (Tr. 217).

Plaintiff saw Dr. Suresh on August 17, 2004, and was "doing well" (Tr. 326). Kidney functions and electrolytes were stable, and blood pressure was well controlled (Tr. 326). Dr. Lalonde noted on September 8, 2004, that plaintiff had not had any seizures since his last visit, but had had some mild

9

diplopia, or double vision (likely caused by the Trileptil), which was improving (Tr. 215).

On September 15, 2004, plaintiff reported a mild exacerbation of flank/lumbar pain with vomiting (Tr. 226). On October 8, 2004, plaintiff complained of right flank pain for the prior four days "secondary to spasm" (Tr. 225). His doctor prescribed Robaxin (Tr. 225).

On October 27, 2004, plaintiff saw Dr. Lalonde for "headache syndrome" (Tr. 213). Plaintiff reported that since he had lost his job and began taking anti-seizure medication, he had been having a lot of headaches, but rarely with phonophobia or nausea (Tr. 213). Plaintiff reported skipping meals, drinking four soft drinks a day, and consuming trigger foods such as onions, bologna, and hot dogs (Tr. 213). Upon examination, plaintiff's strength was 5/5 in all extremities, and neurological examination was unremarkable (Tr. 213). Dr. Lalonde gave him a greater occipital nerve block, which plaintiff tolerated well (Tr. 213). Dr. Lalonde stated that plaintiff's headaches were possibly transformed migraines and likely a chronic tension type of headache (Tr. 213).

On November 19, 2004, plaintiff requested release of his driver's license, claiming that he had not experienced any seizures since May 2004, when he began taking Depakote (Tr. 223). Dr. Poliakova, to whom plaintiff made this request, indicated

10

that she would discuss the issue with Dr. Marasigan (Tr. 223).
An x-ray of the cervical spine taken on November 22, 2004 was
normal (Tr. 249).  On February 18, 2005, plaintiff complained of
kidney pain (Tr. 285).  A CT scan of the urinary tract revealed
"marked atrophy of the right kidney with parenchymal scarring"
and some scarring of the left kidney, as well (Tr. 316).  There
was questionable non-obstructive right renal calculus versus
vascular calcification (Tr. 316).

On the same day, plaintiff saw Dr. Suresh, who noted
that plaintiff had no new complaints (Tr. 325).  Blood pressure
and fluid status were "acceptable" (Tr. 316).  On March 22, 2005,
plaintiff saw Daniel Donovan, M.D. for a neurological
consultation.  He described his seizures as beginning with a
headache and involving loss of consciousness (Tr. 321).  He also
told Dr. Donovan that an MRI showed a "black spot" and that his
migraine type headaches involve photo- and sonosensitivity as
well as nausea and vomiting unless he lies down (Tr. 321).
Physical examination was normal, and plaintiff appeared to be
anxious with some physical restlessness (Tr. 323).  Dr. Donovan
requested that a Depakote level be drawn, that the EEG be
repeated, and that he personally review the MRI (Tr. 324).  Dr.
Donovan also recommended Clonidine to help with sleep complaints
(Tr. 324).

Plaintiff underwent another renal ultrasound on August

11

12, 2005, showing no hydronephrosis of either kidney, but with increased echogenicity, suggesting medical renal disease (Tr. 338). There was also an area on the right kidney suggesting a complex cyst or mass (Tr. 338). On August 17, 2005, plaintiff saw Dr. Marasigan to complain of a flare-up of low back pain and difficulty walking (Tr. 332). Plaintiff also stated that he had had a seizure a week earlier (Tr. 332). Dr. Marasigan noted that the Depakote dose had been reduced 4-5 weeks prior, but increased it at this office visit (Tr. 332). Plaintiff's gait was normal that day (Tr. 332).

Before the hearing, the ALJ sent plaintiff written interrogatories, which plaintiff completed on August 15, 2005 (Tr. 105-14). Plaintiff indicated that he felt he could not work because of a kidney condition, arthritis of the spine, memory problems as a result of transient ischemic attacks, severe migraine headaches, shaking feet and hands, burning sensation from the waist down, tingling in his feet and toes, and seizures (Tr. 106). He stated that his kidney condition and his arthritis cause constant pain, and that he has seizures several times a week (Tr. 107). He indicated that he cannot take pain medication because of his kidneys (Tr. 108). He stated that his medication(s) cause sleepiness, but did not identify which medication(s) caused this side effect (Tr. 109). He stated that he could walk and stand only five minutes before needing to sit

12

or lie down, and that he could only sit for 30 minutes before
needing to stand or lie down (Tr. 110). He estimated that he
could stand and walk 45 minutes each and could sit 4 hours in an
8-hour day (Tr. 110). He estimated that he could lift 5-10
pounds with each hand (Tr. 110).

Plaintiff testified at the hearing on September 13,
2005 that he felt he couldn't work because he can't stand or sit
for a long time and because the narrowing of his spine puts
pressure on his nerves (Tr. 362). He stated that when he walks
his legs give out and he falls (Tr. 362).

The ALJ asked the vocational expert whether there were
any jobs that an individual could perform if that individual was
limited to sedentary work, could not climb, could only
occasionally stoop, bend from the waist to the floor, could not
work around any hazards, could not do any work that could not be
safely interrupted (in case of seizures) and who was limited to
simple, repetitive, nondetailed tasks with no more than casual
and infrequent contact with co-workers and the public, where
supervision would be direct and nonconfrontational, and where
changes in the workplace would be infrequent and gradually
introduced (Tr. 367). The vocational expert responded that such
a person could perform the jobs of hand packer and packager,
production worker, and inspector, tester, sorter, sampler, and
weigher, and that this was a representative list of jobs, not an

13

exhaustive one (Tr. 368).

        The ALJ then asked the vocational expert if a person
with the same limitation but who experienced mild to moderate
pain would still be able to perform the jobs identified (Tr.
369).  The vocational expert responded that such a person would
still be able to perform those jobs (Tr. 369).


                    III.  Conclusions of Law

                    A.  <u>Standard of Review</u>

        This Court's review of the Commissioner's decision is
limited to the record made in the administrative hearing process.
<u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th
Cir. 1991).  The purpose of this review is to determine (1)
whether substantial evidence exists in the record to support the
Commissioner's decision, and (2) whether any legal errors were
committed in the process of reaching that decision.  <u>Landsaw v.
Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir.
1986).

        "Substantial evidence" means "such relevant evidence as
a reasonable mind would accept as adequate to support the
conclusion."  <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th
Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401
(1971)).  It has been further quantified as "more than a mere
scintilla of evidence, but less than a preponderance."  <u>Bell v.

                              14

<u>Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if
the evidence could also support a different conclusion, the
decision of the ALJ must stand if substantial evidence supports
the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v.</u>
<u>Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the
record was not considered as a whole, the Commissioner's
conclusion is undermined. <u>Hurst v. Sec'y of Health & Human</u>
<u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

      B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an
entitlement to benefits by proving his or her "inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months." 42 U.S.C. § 423(d)(1)(A). At the administrative level
of review, the claimant's case is considered under a five-step
sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment,
     it must be determined whether he or she suffers from one of

15

the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u>  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to

_____

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

16

perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.  Plaintiff's Statement of Errors

Plaintiff alleges error in the ALJ's decision to partially discount the credibility of his subjective complaints, arguing that the combined effect of his seizure disorder, chronic headaches, chronic renal insufficiency, reflux neuropathy, and chronic back pain renders him unable to do even the range of sedentary work identified by the ALJ.  Specifically, plaintiff faults the ALJ for noting inconsistencies in (1) plaintiff's identification of the symptoms which forced him to stop working as a truck driver; (2) his report of drowsiness as a side effect of the seizure medication Depakote, despite a physician's note of minimal daytime somnolence; (3) his allegation of disabling back pain against a record of limited medical treatment of the spinal defect causing such pain; and, (4) his allegation of significant memory problems as a result of TIA's, though such problems

17

existed during the time he was able to work as a truck driver. Respectfully, the undersigned concludes that no reversible error is apparent from the ALJ's findings related to plaintiff's credibility.

It is beyond dispute that an ALJ may properly consider the claimant's credibility in assessing the impact of the claimant's subjective complaints on the disability claim.  <u>E.g.</u>, <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997).  Here, as an initial matter, it is noteworthy that the ALJ did not deem plaintiff to be an entirely incredible witness -- indeed, far from it, as the ALJ rejected a physician consultant's less restrictive assessment of the ability to do essentially a full range of light work on his way to making the following findings regarding plaintiff's credibility and residual functional capacity:

> The Administrative Law Judge finds the claimant's allegations regarding his limitations less than fully credible.  While I have no doubt that he experiences some level of pain and discomfort due to his multiple impairments, such has not been shown to be more than mild to moderate or to have produced disabling functional limitations for any continuous twelve month period relevant to this decision.  Although the claimant has had back pain, flank pain, and headaches, the medical evidence shows that these have been intermittent in nature, and that he only occasionally experienced brief pain exacerbations.  A lumbar spine MRI in April 2002 showed only modest findings; and in 2004, cervical spine x-rays and a brain CT were normal. There is no indication that any further lumbar spine diagnostic testing was performed after April 2002, and there is no indication that referral to a physician specializing in such disorders was made, as one would

18

expect if the claimant's treating physicians felt that he had intractable lumbar spine pain. The records show that the claimant's seizures were generally controlled by medications after May 2004, except briefly in August 2005, after his Depakote dosage had been decreased. Dr. Lalonde stated that the claimant's medications had caused some weight gain but no other side effects, and a primary care treatment note of February 2004 stated that daytime somnolence was minimal, although the claimant asserted that his medications caused sleepiness, and indicated that he napped several times daily for several hours each time. Dr. Donovan diagnosed aura/vascular migraine, without intractable pain. This is consistent with the treatment notes, which indicate that the claimant's head and neck pain were generally not more than moderate in severity.

Accordingly, the undersigned finds the claimant retains the following residual functional capacity: to perform sedentary work provided he do no climbing; no more than occasional stooping, bending from the waist to the floor, crouching, or crawling; do no work around hazards such as machinery and heights; and do no driving of motor vehicles. In addition, the claimant needs to have work that can be "safely" interrupted, and is limited to performing simple, repetitive non-detailed tasks where co-worker and public contact is casual and infrequent, where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced.

(Tr. 22)

It is the province of the ALJ, the finder of fact, to resolve conflicts in the evidence and to determine the credibility of witnesses who appear before him. Sullenger v. Comm'r of Soc. Sec., 255 Fed.Appx. 988, 2007 WL 4201273, at **7 (6th Cir. Nov. 28, 2007)(citing Smith v. Halter, 307 F.3d 377, 379 (6th Cir. 2001)). "[T]he ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective

19

medical evidence contradict each other." <u>Moon v. Sullivan</u>, 923

F.2d 1175, 1183 (6th Cir. 1990).  Given his opportunity to

observe plaintiff's demeanor while testifying, the ALJ's

credibility finding is due "great weight and deference" upon

judicial review.  <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 476

(6th Cir. 2003).  Accordingly, this court is "limited to

evaluating whether or not the ALJ's explanations for partially

discrediting [plaintiff] are reasonable and supported by

substantial evidence in the record."  <u>Id.</u>

It appears that the ALJ properly took account of the

effect of plaintiff's combination of impairments, and without

discounting plaintiff's back pain as a factor, reasonably

concluded that it was plaintiff's seizure disorder that forced

him to leave his job as a commercial truck driver.  Though

plaintiff's history of chronic difficulties with memory and

attention was recognized by the ALJ, he reasonably concluded that

such difficulties standing alone were not significantly work-

affective, as plaintiff was able to continue as a truck driver

despite this history, until his seizures began (Tr. 19).[3]

Despite this finding of nonseverity with regard to plaintiff's

memory and attention difficulties, it is clear that the ALJ gave

_____

[3]Although not mentioned by the ALJ, it is perhaps noteworthy that
plaintiff's wife qualified the persistence of these difficulties when she
reported on an agency questionnaire that plaintiff's memory and concentration
are "bad after seizures," and further indicated that he can pay attention "for
a long time unless he has seizures."  (Tr. 77)

20

due consideration to such difficulties in combination with plaintiff's other impairments when he determined plaintiff's RFC to include the "limit[ation] to performing simple, repetitive non-detailed tasks where co-worker and public contact is casual and infrequent, where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced."

Moreover, despite the logical appeal behind plaintiff's argument that increasing dosages of Depakote (a medication known to cause drowsiness as a side effect) would presumably have caused a level of daytime drowsiness over and above that which was referred to as minimal in February 2004 (Tr. 230), the undersigned cannot fault the ALJ for finding that such drowsiness was not so significant as to interfere with plaintiff's ability to work on a regular and continuing basis. As noted by the ALJ, Dr. Marasigan stated in January 2004 that plaintiff experienced drowsiness after a 500 milligram per day dosage of Depakote was prescribed (Tr. 233-34, 235). However, the next month, Dr. Marasigan noted that "daytime somnolence is minimal," and ordered the Depakote dosage doubled, to 1000 milligrams per day (Tr. 230). The ALJ then made note of record evidence from June 2004 reflecting that even on this increased dosage of Depakote, plaintiff reported "some weight gain but no other side effects," and that he was sleepy for about an hour following a seizure (Tr.

21

219).  (Tr. 20)  While it appears that plaintiff's dosage of
Depakote was eventually increased to 2000 milligrams per day by
the time of the hearing (Tr. 364), there is insufficient evidence
of corresponding side effects so severe as to significantly
interfere with the ability to work, such that the ALJ's decision
should be set aside.

Plaintiff also testified that he has difficulty with
extended sitting, standing and walking due to "narrowing of the
spine" and resulting neurological pain (Tr. 362), described by
plaintiff as sharp and stabbing (Tr. 108).  However, the ALJ
noted that the only lumbar spine MRI of record revealed minimal
defects, including only minimal narrowing of the L3 disc space
without any significant narrowing of the spinal canal or
neuroforamina (Tr. 275).  The ALJ further noted that, despite
plaintiff's statement that his difficulty walking included his
legs giving out as result of pressure on the nerve from narrowing
of the spine, resulting in a fall (Tr. 362), plaintiff had never
reported such incidents to his physicians (Tr. 19-20).  The ALJ
reasonably noted the absence of any attempt to consult a
specialist for treatment of a level of pain out of proportion to
his objectively verified defects, suggesting that no such
complaints were consistently voiced to plaintiff's physicians.
Substantial record evidence of plaintiff's complaints to his
physicians supports the notion that plaintiff's back pain would

22

flare up intermittently (Tr. 226, 240, 332) from a baseline level of pain that was less than plaintiff's testimony suggests.

While plaintiff further stated that he could not take pain medication on account of his kidney problems (id.), it appears that plaintiff was in fact able to take muscle relaxant medications such as Flexeril (Cyclobenzaprine) (Tr. 324-27, 335-36), prescribed for relief of the muscle tension component of his headaches, and Robaxin (Tr. 225, 244) and Skelaxin (Tr. 239-40), prescribed for relief of the paraspinal muscle spasm, though he was apparently unable to take narcotic analgesics and other medications containing aspirin (Tr. 134).[4] Even without the ability to tolerate painkilling medication, however, plaintiff did not frequently complain of significant pain in his lower back, but reported only isolated periods of exacerbated pain (Tr. 226, 332) and requested the release of his driver's license in November 2004 (Tr. 223), as noted by the ALJ. Also consistent with this conclusion that plaintiff's back pain and resulting limitations were typically no more than moderate is the opinion of Dr. Donovan, a neurologist who examined plaintiff upon referral from Dr. Marasigan, and who noted that plaintiff had chronic low back pain due to degenerative joint disease, but was nevertheless in no physical distress at the time of his

---

[4]The record does indicate that plaintiff was prescribed the narcotic oxycodone in combination with acetaminophen (Tylox) at times in 2003 and 2004. (Tr. 62, 72, 101-02, 241, 302)

23

examination, and retained normal muscle tone and strength in his lower extremities, as well as the ability to perform straight leg raises to ninety degrees bilaterally. (Tr. 21, 322-24) In short, the decision to discount plaintiff's complaint of disabling back pain was reasonable and substantially supported.

As to plaintiff's other complaints associated with his kidney dysfunction and headaches, it is not argued nor does it appear that a persistent level of disabling pain from either source is reflected in the record. The undersigned finds that the ALJ gave sufficient consideration to these ailments in assessing plaintiff's combination of impairments -- without the benefit of any treating source RFC assessments -- and finding that this combination prevented all but the limited range of sedentary work identified.

In view of the substantial evidence supporting the final agency decision in this case, and giving the administrative finding of plaintiff's credibility the deference it is due, the undersigned concludes that the decision should be affirmed.


## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the Commissioner of Social Security be **AFFIRMED**.

24

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 10th day of July, 2008.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE